UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TVI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06-CV-697 (JCH) |
| | ) | |
| INFOSOFT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

The matter is before the Court following a bench trial conducted on January 7-8, 2007. Having considered the pleadings, trial testimony, and exhibits submitted by the parties, the Court makes and enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

1.    Plaintiff TVI, Inc. is a national chain of thrift stores incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.

2.    Defendant Infosoft Technologies, Inc. is a software system developer and distributor of computer hardware incorporated under the laws of Missouri with its principal place of business in Jefferson County, Missouri.

3.    In October 2004, the parties entered into a business relationship where Defendant developed software to enhance Plaintiff's cash register system. During the business relationship, Plaintiff purchased computer hardware and equipment from Defendant to use with the software.

4.     Defendant had developed two relevant software programs, INFOTAG™ and INFOsoftLP™ ("LP"), that aided companies in collecting, tracking, and organizing data on inventory and sales throughout their various stores.

5.     This business relationship was comprised of several separate written agreements and began on October 27, 2004.

6.     It ended on March 20, 2006 when J. Brad Jarrett ("Mr. Jarrett"), Defendant's CEO and President, sent Plaintiff an email terminating the relationship. (Pl.'s Ex. 15).

**Software Development Agreement**:

7.     On October 27, 2004, The parties entered into the "Infosoft Agreement for TVI Pilot" ("Pilot Agreement") which stated that Defendant would:

> install three test sites of TVI, Inc. (sic) choosing and setup of a dedicated server in Infosoft Technologies (sic) office to evaluate the solution. TVI will be required to pay a $15,000 retainer in advance that will be credited toward the cost of software if and when a full contract is executed. If Infosoft Technologies fails to meet criteria outlined in the Success Criteria section, the retainer will be refunded to TVI, Inc.

> If Infosoft Technologies meets criteria and TVI, Inc. decides not to execute a full contract, then the retainer is forfeited.

(Pl.'s Ex. 2).

8.      The Pilot agreement contained the following "Success Criteria":

> 1) Infosoft Technologies installs 3 test sites of TVI Inc. (sic) choosing and set up of a dedicated server in the Infosoft Technologies (sic) office to evaluate the solution.
> 2) The following included reports can be verified as complete and accurate:
>         a) Daily Sales Reports
>         b) Labor Reporting
>         c) Category Reports
>         d) All Listing Reports
>         e) Basket Analysis
>         f) Ticket Searches
> 3) Complete, reliable, and accurate end-to-end data collection
> 4) Ability to determine data loss via exception logs
> 5) Ability to centrally administer Dept, PLU, Tax, Discount and Coupon changes
> 6) Reliable server functionality

(Id.).

9.    On November 21, 2004, the parties executed the "InfoSoft Technologies Software and

Custom Development Plan" ("Development Agreement"), which reflected Plaintiff's decision

to move forward with its pilot program. (Pl.'s Ex. 3).

10.    In relevant part, the Development Agreement stated:

**Phase 1– 3 to 5 stores**

1.    Development of stand alone ticketing application (InfoTag) -- the source code for this application and the associated documentation will be provided to TVI, Inc. upon acceptance. TVI, Inc. will own this application outright with unrestricted rights to reproduce, distribute, install, maintain, and/or modify the source code as needed

2.    Data capture from existing TEC 1650 with present register operation plus color as per the signed agreement dated 10/27/04

3.    Date capture of 1650 with basic Category/POP/Color PLU and PLU File Support as per the signed agreement dated 10/27/04

4.    Discount calculation and identification in detail

5.    Floating Cashier capability at SLC (Store Level Controller) and Cash Office

6.    Service Desk operation with Gift/Exchange Card (InfoREWARDS™)

7.    Ragout process

8.    Sales Audit and LP Basics at Bellevue

9.    Sales reporting of collected data as per the signed agreement dated 10/27/04

10.    Data Warehouse

11.    InfoREWARDS™

12.    Register parameter and price file maintenance from Bellevue as per the signed agreement dated 10/27/04

13.    Training and Documentation as per the signed agreement dated 10/27/04

(Id.).

11.     The Development Agreement also stated:

Because Phase 1 is really an implementation plan, full use of the InfoSoftLP™ software and the exact work cannot be defined, a retainer totaling $50,000 is requested. TVI, Inc. has already submitted a retainer of $15,000 as part of this retainer as per the signed agreement dated 10/27/04. InfoSoft Technologies will bill development times, implementation efforts and travel expenses against this retainer. TVI, Inc. will be supplied with a monthly invoice outlining all charges and expenses. Any unused portion of the retainer if any will either be refunded or credited to the purchase of InfoSoftLP software. If retainer amount drops below $5,000 and additional work is requested, an additional retainer may be requested.

(Id.).

12.     Plaintiff was pleased with the software and on October 21, 2005, the parties executed the

following Lease Agreement:

Infosoft Technologies, Inc. . . . will install full verison InfoSoftLP™ web software for use and evaluation on a Savers[1] located web server. . . . Infosoft will provide ongoing support of the InfoSoftLP™ server along with modifications as outlined in the retainer agreement dated December 6, 2004.

In addition, Savers will be required to pay a monthly lease fee of $2,500 paid in quarterly installments. Shall Savers purchase the software by July 31, 2006, 100% of the monthly lease fees will be applied toward the purchase of the InfoSoftLP software. If purchased by September 30, 2006, any lease payments made between August 1, 2006 and September 30, 2006, 80% will be applied to purchase price. Any lease payments made after November 1, 2006, 60% will be applied to purchase price. . . .

Savers agrees to keep confidential any source code, processes and functions developed by InfoSoft and will not utilize any portions of such code for anything other than InfoSoftLP functions.

. . . this Letter of Agreement will constitute our binding agreement.

(Pl.'s Ex. 9).

13.     Prior to the relationship's termination in March 2006, Plaintiff was pleased with LP's

performance.

---

[1]Plaintiff does business under the name Savers.

14.   Plaintiff received the last update for LP in February 2006.

15.   On March 20, 2006, Mr. Jarrett demanded that Plaintiff remove LP from its computers. (Pl.'s Ex. 15).

16.   On April 4, 2006, Mr. Jarrett told Plaintiff that the software agreement would be "honored." (Pl.'s Ex. 16).

17.   On April 14, 2006, Mr. Jarrett again told Plaintiff that they were in violation of the Lease Agreement and demanded that it uninstall LP from its computers. (Pl.'s Ex. 19).

18.   Plaintiff offered to place the lease payments in escrow, but that offer was rejected. (Pl.'s Ex.18-19).

19.   As of March 20, 2006, LP was almost completed. John Leech ("Mr. Leech"), Plaintiff's Director of Information Technology, stated that LP provided Plaintiff with about seventy-five percent of what it needed. Plaintiff planned to discontinue using LP after Mr. Jarrett's demands to do so. Due to LP's complexity, the removal took almost six months to complete.

20.   Mr. Jarrett testified that Defendant completed the items listed in the Development Agreement and set out in detail how each was accomplished.  He also testified that items four, five, and six were not implemented on Plaintiff's orders. He could not recall if item seven was implemented.

21.   Plaintiff did not try to exercise the option contained in the Lease Agreement because Defendant had filed a copyright infringement suit alleging improper use of the software.

22.   Because it did not exercise the option, Plaintiff had to develop software to replace LP. It was able to develop and implement a much simpler  program.

### Contracts Underlying Plaintiff's Claims

### Sales Order 472

23.    On April 29, 2005, Plaintiff agreed to purchase 128 Toshiba TEC Model 1650 cash registers and related equipment from Defendant for $223,196.50. (Pl.'s Ex. 4).

24.    Plaintiff paid in full for the cash registers and Defendant delivered 109 of the cash registers as promised.

25.    The remaining registers were never delivered, and Defendant stipulated that it owes Plaintiff $26,269.54 because of its failure to deliver the registers.

**Sales Order 516**

26.    On June 2, 2005, Plaintiff agreed to purchase thirty-six Toshiba TEC B-452 barcode printers from Defendant.

27.    Defendant delivered twenty-six printers as required under the contract. The final ten were never delivered.

28.    Defendant stipulated that it owes Plaintiff $6,240 because of its failure to deliver the printers.

**June 29, 2005 Agreement**

29.    In late June 2005, Defendant bought 1000 used Toshiba Model B-452 barcode label printers from Illinois Wholesale. Mr. Jarrett testified that used printers of this model are not always readily available.

30.    On June 29, 2005, the parties entered into a written agreement where TVI agreed to purchase 647 refurbished Toshiba Model B-452 barcode label printers and accessories.

31.    The June 29, 2005 Agreement, in pertinent part, stated:

We are excited to extend to TVI, Inc., the following offer for the purchase of 650 refurbished B-452 Printers:

Savers cost is $500 per printer including the parallel port. This would include the following:

1. Printers changed from 12v to 120v power supplies
2. Refurbish and testing

3. Procure label feed spools
4. Remove locking plate and add rubber feet
5. 2 year warranty on printer begins on delivery
6. 6 month warrant on print head begins on delivery
7. Infosoft Technologies will give TVI, Inc. a minimum of 100 but up to 200 hundred extra printers at no charge to use as backups, depending on parts availability. These printers would not have feed spools, but would be equipped with 120 volt power supplies. These printers will be shipped to the store of TVI, Inc.'s choosing. The same warranty applies to these printers.

Your total P.O. would be $325,000.[2] Shipping to stores billed separately. This is to be paid by July 15, 2005. Printers will be stored at Infosoft Technologies until needed.

(Pl.'s Ex. 8).

32.    Plaintiff paid $323,500, the full amount owed under the June 29, 2005 Agreement.

33.    As of March 20, 2006, Defendant had delivered twelve printers as instructed by Plaintiff.

34.    Defendant originally tried to buy the new power supplies from Toshiba, but had trouble finding a supplier. Ultimately, it decided to have an engineering company in California produce them.

35.    Defendant notified Plaintiff of this problem in October 2005. Plaintiff agreed to the manufactured power supplies so long as they were "safe and working." To make sure they were safe, it requested "UL Certification."

36.    Underwriters Limited, known as UL, is a company that tests power devices and certifies their safety. UL certifies virtually every power supply used in electronic devices.

37.    By November 28, 2005, Defendant had not received UL certification and asked Plaintiff if it would pay an additional $2,000 so that Defendant could buy forty power supplies for some of the printers that Plaintiff had requested delivery of. (Def.'s Ex. IIII).

_____

[2]This number is $1500 greater than the amount paid because the parties later agreed that only 647 printers, plus backups, would be purchased.

38.     Mr. Leech responded that he was "concerned with the perceived lack of responsiveness and concern from Infosoft in regards to this printer power supply issue" because the delays in the power supplies "ha[d] severely impacted our implementation schedule." Mr. Leech also agreed to pay the additional $2,000, but reminded Mr. Jarrett that "Infosoft needs to be responsible for any costs beyond that." (Id.).

39.     Shortly thereafter, Mr. Leech sent a response apologizing for his harshness. This second response still complained that Defendant led him to believe that the printer refurbishment "would be doable in time" and reminded Mr. Jarrett that "your support in getting the required equipment is huge." (Id.).

40.     The parties held weekly status meetings on the project. At the January 6, 2006 meeting, Plaintiff expressed concern about delivery of the printers. Defendant stated that they would be delivered in "a couple of weeks." (Pl.'s Ex. 12).

41.     On March 2, 2006, Plaintiff ordered Defendant to refrain from shipping any more printers because some of the recently shipped printers were having software issues. (Def.'s Ex. UUUU).

42.     On March 6, 2006, Dave Miller ("Mr. Miller"), one of Plaintiff's Information Technology Project Managers, asked Mr. Jarrett when the power supplies would be ready. (Pl.'s Ex. 13).

43.     On March 14, 2006, Defendant told Mr. Miller that the power supplies would be available on March 17, 2006. (Pl.'s Ex. 14).

44.     On April 4, 2006, Mr. Jarrett told Plaintiff that the "printer agreement is also honored." (Pl.'s Ex. 16).

45.     On April 4, 2006, Raymond Clawson, one of Plaintiff's employees, sent the following response to Mr. Jarrett:

Great, since these printers have been prepaid 100%, how do we schedule delivery of these items?

We are prepared to take possession of them in bulk assuming they are complete as outlined in the agreement. I can provide a ship to address as soon as they are available to ship.

Please let me know what your timeline is to provide these.

(Id.).

46.     Mr. Jarrett responded that "when all invoices are settled, we are prepared to send in palletized bulks of about 100 printers per week. Savers will be responsible for the shipping and packaging costs." (Id.).

47.     After being asked for a estimate of the packaging and shipping costs, Mr. Jarrett wrote:

that 3/4 of the printers have been refurbished, i.e. cleaned, added paper guides, broken parts replaced. The power supplies are retro'd as we were shipping them to stores. To retro 600 power supplies will take some time and was not part of the original roll out plan. So shipping a pallet of about 100 at a time is probably the best bet, otherwise it will take 6 to 8 weeks to get them ready to ship all at once.

(Id.).

48.     On April 10, 2006, Mr. Jarrett threatened to return to Toshiba "the 1650 terminals purchased last year." (Pl.'s Ex. 17).

49.     On April 14, 2007, Bradley Whiting, Plaintiff's General Counsel, sent Mr. Jarrett a letter asking him to "please prepare and deliver to TVI a written plan by April 21, 2006 detailing the delivery schedule for the refurbished" printers to "fulfill the requirements of the June 29, 2005 agreement." (Pl.'s Ex. 18).

50.     That day, Mr. Jarrett responded that Defendant "does not agree to the terms of this letter" and threatened to return "all equipment to Toshiba/TEC" on April 17, 2006. (Pl.'s Ex. 19).

51.     On April 24, 2006, Mr. Jarrett emailed Don Gorski, Plaintiff's CEO, to inform him that "[w]e will also be returning all equipment to Toshiba/TEC this week." (Pl.'s Ex. 20).

52.     The April 24, 2006 threat prompted Plaintiff to seek a Writ of Attachment because it believed Defendant had no intention of performing and was going to send the equipment to Georgia, where Toshiba is located.

53.     On April 28, 2006, Plaintiff received a Writ of Attachment from this Court and seized 543 used printers and fifty-nine cash registers. (Pl.'s Ex. 28-29).

54.     Mr. Miller testified that the seized printers were not refurbished. None had power supplies and many had missing parts. Mr. Jarrett testified that 400 printers had been refurbished, but that the United States Marshals only seized a portion of the refurbished printers.

55.     On May 22, 2005, Plaintiff learned that Defendant was attempting to sell "200+ TEC B-452 Printers with 12v connection." Defendant's advertisement also stated that "most of them have been refurbished. $200 each or make offer for ALL." (Pl.'s Ex. 34).

56.     In order to replace the 635 undelivered printers, Plaintiff bought 331 new Toshiba Model B-452 barcode label printers from Portland Cash Register for $902 per printer. (Pl.'s Ex. 55). These printers were $402 more expensive than those purchased under the June 29, 2005 Agreement. Plaintiff and Portland Cash Register have a longstanding business relationship.

57.     In order to replace the 635 undelivered printers, Plaintiff bought 304[3] new Toshiba Model B-452 barcode label printers from Pacific Cash Register for $995 per printer. (Pl.'s Ex. 57). These printers were $495 more expensive than those purchased under the June 29, 2005 Agreement. Plaintiff and Pacific Cash Register have a longstanding business relationship.

---

[3]Plaintiff actually bought an additional 354 printers; however only 304 were needed to replace the printers ordered from Defendant.

58. In total, Plaintiff spent an additional $283,542 when it was forced to buy printers from Pacific Cash Register and Portland Cash Register. Additionally, Defendant never refunded the $317,500 Plaintiff had previously paid for the undelivered printers.

59. Plaintiff contacted five to six dealers when trying to replace these printers.

## Sales Order 715

60. On December 14, 2005, Plaintiff agreed to purchase ninety-nine Toshiba TEC Model 1650 cash registers from Defendant for $143,281.48. (Pl.'s Ex. 11).

61. Prior to the March 20, 2006 termination, Plaintiff instructed Defendant that it did not want the registers delivered until it asked for them.

62. Plaintiff paid in full, and Defendant deliver thirty-two of the registers prior to the March 30, 2006 termination.

63. Following the termination, Plaintiff asked for delivery on at least one occasion. (Pl.'s Ex. 18).

64. Defendant made multiple threats to return these registers to Toshiba. (Pl.'s Ex. 17, 19-20).

65. The amount paid for the undelivered cash registers totaled $96,967.76.

66. Plaintiff had to purchase additional cash registers from Portland Cash Register to replace the sixty-seven undelivered registers. (Pl.'s Ex. 24). The register purchased through Portland Cash Register cost Plaintiff $29.32 more per register. In total, the new registers cost $1964.44 more than the registers in Sales Order 715.

### Contracts Underlying Defendant's Counterclaims

67. At trial, Defendant stipulated that it owed Plaintiff an additional credit of $32,323.11.

## Stipulated Invoices

68. At trial, Plaintiff stipulated that it owed the amounts listed on the following invoices (Def.'s Ex. A):

a.      Invoice No. 205634, listing a balance owed of $693.97.

b.      Invoice No. 206085, listing a balance owed of $2,841.

c.      Invoice No. 206086, listing a balance owed of $1,368.

d.      Invoice No. 206126, listing a balance owed of $500.

e.      Invoice No. 206291, listing a balance owed of $123.

**Invoice No. 205878**

69.    On November 15, 2005, Defendant issued Invoice No. 205878 to Plaintiff for one Galaxy computer. The amount listed in the invoice is $1,432.65. (Def.'s Ex. C).

70.    The parties agree that this computer was delivered to Plaintiff.

71.    This computer was an evaluation model, meaning Plaintiff was trying it out before determining if it wanted to buy it.

72.    Mr. Miller informed Susan Jarrett ("Mrs. Jarrett"), Defendant's Vice President of Operations, that Plaintiff wanted to return the computer. Mr. Miller asked Mrs. Jarrett to send a Return Merchandise Authorization, but none was sent. The computer was never returned to Defendant.

**Invoice No. 206229**

73.    On March 15, 2006, Defendant issued Invoice No. 206229 to Plaintiff for work done per the Development Agreement. The amount listed in the invoice is $2,263.75. (Def.'s Ex. G).

74.    It listed 1.33 hours of "Savers Auditing System" work was done on March 14, 2006 at an overall costs of $166.25.

75.    It also listed 16.78 hours for "InfoTag Updates" performed on March 15-16, 2003. This time supposedly related to work done by Jeff Collins ("Mr. Collins"), one of Defendant's computer programmers.

76.     At trial, Mrs. Jarrett testified that invoices were not sent until the product was shipped or the service performed. Mrs. Jarrett, however, could not offer an explanation how Defendant was able to bill for work performed before the date of performance.

**Invoice No. 206266**

77.     On March 23, 2006, Defendant issued Invoice No. 206266 to Plaintiff for the travel and meal expenses of Mr. Collins between February 22, 2006 and March 3, 2006.(Def.'s Ex. H). The amount listed in the invoice is $623.46.

**Invoice No. 206272**

78.     On March 28, 2006, Defendant issued Invoice No. 206272 to Plaintiff for the seven Toshiba TEC Model 1650 cash registers. The amount due is $13,206.66.(Def.'s Ex. I).

79.     Plaintiff originally placed this order in January. Defendant could not produce any evidence of a purchase order or of its acceptance of this order.

80.     The order was never acted on because Defendant did not receive a down payment from Plaintiff. (Def.'s Ex. BBBBB).

81.     On March 20, 2006, Plaintiff contacted Mrs. Jarrett and told her that these printers must arrive by tomorrow and that if she needed to, she could "use registers from the inventory or 99 registers that we purchased in December, 2005." (Id.).

82.     On March 21, 2006, Plaintiff canceled this order. (Id.).

83.     Mrs. Jarrett stated the Printers were either shipped in "approximately February" 2006, March 28, 2006 or March 30, 2006. Aside from Mrs. Jarrett's testimony, Defendant failed to produce any evidence that these printers were shipped.

**Invoice Nos. 206292 and 206776**

84.    On April 3, 2006, Defendant issued Invoice No. 206292 to Plaintiff for the quarterly lease payment due under the Lease Agreement. The invoice stated that Plaintiff owed $7,500. (Def.'s Ex. K)

85.    On June 1, 2006, Defendant issued Invoice No. 206776 to Plaintiff for the final lease payment due under the Lease Agreement. The invoice stated that Plaintiff owed $10,000. (Def.'s Ex. N).

**Invoice No. 206304 and 206296**

86.    On April 12, 2006, Defendant issued an invoice for 781 printer shoes to Plaintiff. The amount due is $27,350. (Def.'s Ex. M).

87.    These printer shoes were meant to be used on the refurbished cash registers as a way to make it easier to manipulate certain parts on the cash printers. Mr. Jarrett testified that Plaintiff agreed to have these items made. (Def.'s Ex. 00).

88.    On April 5, 2006, Defendant issued an invoice for a "Die for RJ45 Punch for 1650" to Plaintiff. (Def.'s Ex. L). The invoice stated that Plaintiff owed $1,065. Mr. Jarrett explained that the die was used to manufacture the printer shoes.

89.    On April 28, 2006, Plaintiff filed its Complaint containing the following claims: (I) request for temporary restraining order and preliminary and permanent injunction; (II) breach of contract, Sales Order 715; (III) breach of contract, Sales Order 472; (IV) breach of contract, June 29, 2005 Agreement; (V) breach of contract, Sales Order 516; (VI) breach of contract, Development Agreement and Lease Agreement; and (VII) conversion. (Doc. No. 1).

90.    On June 27, 2007, Defendant filed its Second Amended Counterclaims containing the following claims: (I) copyright infringement of LP; (II)copyright infringement of InfoSoft CAPTURE; (III) copyright infringement of InfoSoft INFOPAK; (IV) copyright infringement

of InfoSoft INFOLINK; (V) Unjust enrichment related to software; (VI) suit on account for unpaid invoices; (VII) unjust enrichment related to unpaid invoices; (VIII) quatum meruit, related to unpaid invoices; (IX) breach of contract related to unpaid invoices; (X) anticipatory breach of contract; (XI) breach of implied covenant of good faith and fair dealing, Development Agreement; and (XII) breach of supply contract. (Doc. No. 74).

91. Both parties requested the awarding of prejudgment interest. (Doc. No. 1; Doc. No. 74).

92. Defendant voluntarily dismissed with prejudice Counts I-V of its Second Amended Counterclaim on July 19,2007. (Doc. No. 80).

93. On November 15, 2007, the Court dismissed Count XII of the Second Amended Counterclaim. (Order of Nov. 15, 2007, Doc. No. 102).

## Conclusions of Law

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy is over the statutory limit of $75,000. Venue is proper under 28 U.S.C. § 1391 because Defendant resides in the Eastern District of Missouri.

2. The central issue in this case is determining whether, and to what extent, the parties breached the multiple contracts at issue in this case.

3. Plaintiff has abandoned Count I of the Complaint, meaning it is dismissed. (Pl.'s Trial Br., Doc. No. 119 at p. 6 n. 1). This dismissal does not affect the previous Writ of Attachment entered by this Court.

4. Count VII of the Complaint is dismissed because Plaintiff failed to put forward any evidence of conversion.

5.  In Missouri, to prevail on a breach of contract claim, a plaintiff must prove "the existence of a contract or agreement and the terms of that agreement, that the plaintiff performed or tendered performance, that the defendant did not perform, and that the plaintiff was thereby damaged." Shirley's Realty, Inc. v. Hunt, 160 S.W.3d 804, 807 (Mo. Ct. App. 2005).

6.  Additionally, the Uniform Commercial Code ("UCC"), which Missouri has adopted, states that when a sales contract leaves one or more terms open, the contract does not fail for indefiniteness "if the parties intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Computer Network, Ltd. v. Purcell Tire & Rubber Co., 747 S.W.2d 669, 674 (Mo. Ct. App. 1988). The UCC supplies the missing terms.

7.  The UCC does not apply to the Pilot Agreement, Development Agreement, or Lease Agreement, but does apply to all other contracts because they all relate to the sale of goods.

8.  Under the UCC, when a seller fails to tender delivery, the buyer "in addition to recovering so much of the price as has been paid" may "'cover' and have damages under section 400.2-712 as to all the goods affected whether or not they have been identified to the contract." Mo. Rev. Stat. § 400.2-711(1)(a).

9.  The buyer covers by "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Id. at § 400.2-712(1).

10. If a party elects to cover, the buyer may recover from the seller "as damages the difference between the cover cost and the contract price together with an incidental or consequential damages . . . ." Id. at § 400.2-712(2).

11. The seller has the burden of showing that the cover was unreasonable. Apex Mining Co. v. Chicago Copper & Chem. Co., 340 F.2d 985, 987 (8th Cir. 1965) (applying Missouri law).

Whether a buyer has made a reasonable attempt to cover is a question for the factfinder. <u>H & W Indus., Inc. v. Occidental Chem. Corp.</u>, 911 F.2d 1118, 1123 (5th Cir. 1990).

12. Other courts have held that the substitution of a slightly different product when covering is acceptable so long as no evidence existed "from which the court could conclude that . . . cover was made in bad faith or with unreasonable delay." <u>Universal Builders Corp. v. United Methodist Convalescent Homes of Conn., Inc.</u>, 508 A.2d 819, 823 (Conn. App. Ct. 1986) (holding that purchase of slightly different good was permissible to prevent bottleneck in construction).

13. The use of a reliable, long time supplier justifies paying a higher price when effecting cover. <u>Milwaukee Valve Co., v. Mishawaka Brass Mfg., Inc.</u>, 319 N.W.2d 885, 889 (Wis. Ct. App. 1982).

14. Failing to make inquiries to other suppliers can indicate the unreasonableness of cover. <u>Productora E. Importadora De Papel, S.A. De C.V. v. Fleming</u>, 383 N.E.2d 1129, 1138 (Mass. 1978).

15. A buyer, however, may not utilize cover to "put himself in a better position than he would have been had the contract been performed." <u>Martella v. Woods</u>, 715 F.2d 410, 413 (8th Cir. 1983) (applying Missouri law). Specifically, <u>Martella</u> held that plaintiff could not recover cover damages on certain heifers because the replacements were larger and contained more pregnant heifers.

16.  Stipulations by the parties regarding "questions of fact are conclusive," and the Court is bound by them. <u>Gander v. Livoti</u>, 250 F.3d 606, 609 (8th Cir. 2001).

**Count II of the Complaint**

17.   As previously stated, Count II of the Complaint is a breach of contract action based on Sales Order 715.

18.   In the a prior summary judgment order, the Court held that a contract existed, Plaintiff fully performed by making payment, Defendant failed to perform by refusing delivery, and that damages would be determined by a trial on the merits. (Order of Sept. 13, 2007, Doc. No. 88 at pp. 9-10).

19.   The $96,967.76 paid by Plaintiff for registers never delivered is recoverable under Mo. Rev. Stat. § 400.2-711(1).

20.   The $1,964.44 for cover represents the difference between the price paid Portland Cash Registers and the amount paid under Sales Order 715. The Court finds that this cover was reasonable and done in good faith.

21.   As such, judgment will be entered in Plaintiff's favor on Count II of the Complaint in the amount of $98,932.20.

**Count III of the Complaint**

22.   As previously stated, Count III of the Complaint is a breach of contract claim based on Sales Order 472.

23.   At trial, Defendant stipulated that it was liable for $26,296.54, the amount Plaintiff was seeking in damages on this Count. The Court must enforce this stipulation. Gander, 250 F.3d at 609.

24.   As such, judgment will be entered in Plaintiff's favor on Count III of the Complaint in the amount of $26,296.54.

**Count IV of the Complaint**

25. As previously stated, Count IV of the Complaint alleges a breach of contract claim based on the June 29, 2005 Agreement.

26. To prevail on a breach of contract claim, a plaintiff must prove "the existence of a contract or agreement and the terms of that agreement, that the plaintiff performed or tendered performance, that the defendant did not perform, and that the plaintiff was thereby damaged." Hunt, 160 S.W.3d at 807.

27. In a prior summary judgment order, the Court held that the June 29, 2005 Agreement was a valid contract and that Plaintiff performed. (Order of Sept. 13, 2007, Doc. No. 88 at p. 11).

28. Defendant asserts that it is not liable for a breach of contract because it attempted to tender delivery in a reasonable time and Plaintiff's actions made it impossible to effect delivery under the contract.

29. Under the UCC, the place of delivery of the goods is "the seller's place of business" and delivery must be made in "a reasonable time." Mo. Rev. Stat. § 400.2-308(a), .2-309(1). Furthermore, the seller does not tender delivery until it "gives the buyer any notification reasonably necessary to enable him to take delivery." Id. at § 400.2-503(1). A seller must keep the tendered goods available "for the period reasonably necessary for the buyer to take possession." Id. at § 400.2-503(1)(a). Finally, when the contract involves repeated occasions for performance by either party, any "course of performance accepted or acquiesced to without object shall be relevant to determine the meaning of the agreement." Id. at § 400.2-208(1).

30. Impossibility is a defense to a breach of contract claim. It is based on the principle that "if a party, by contract, is obligated to a performance that is possible to be performed, the party

must make good unless performance is rendered impossible by an Act of God, the law, or the other party." Bolz v. Hatfield, 41 S.W.3d 566, 573 (Mo. Ct. App. 2001).

31.   A party pleading impossibility must "demonstrate that it took virtually every action within its powers to perform its duties under the contact. Farmers' Elec. Co-op., Inc. v. Mo. Dep't of Corrs., 977 S.W.2d 266, 271 (Mo. 1998)).

32.   The Court finds that Defendant breached the June 29, 2005 Agreement because it did not tender delivery, or even offer Plaintiff a feasible delivery schedule. Defendant's threats to return "all equipment" and its rejection of any proposed delivery schedule show that delivery was not made within a reasonable time.

33.   Defendant's cannot rely on the attempt to find UL certified power supplies as a modification that delayed delivery. Defendant could have procured the power supplies from Toshiba. The June 29, 2005 Agreement placed the burden of finding suitable power supplies on Defendant. Additionally, Defendant had approximately nine months to find suitable power supplies.

34.   The Court also finds that the Plaintiff's attachment of the printers does not support an impossibility defense.

35.   The evidence shows that Defendant did not take "virtually every action within its power to perform." Bolz, 41 S.W.3d at 573. Defendant did not obtain alternative power supplies when the UL certification dragged on for months. Defendant did not provide Plaintiff with a delivery schedule after the relationship terminated. Defendant told Plaintiff that it would withhold delivery until other, unrelated invoices were paid. Defendant threatened to return "all equipment" to Toshiba. In sum, Defendant's actions show virtually no attempt to deliver the printers. Rather, Defendant's actions served as the catalyst for Plaintiff seeking the Writ of Attachment.

36.    Plaintiff is entitled to $317,500, which represents the amount paid for undelivered printers that is recoverable under Mo. Rev. Stat. § 4.2-711(a).

37.    Upon consideration, the Court finds that Plaintiff's cover in the amount of $283,452 was reasonable and in good faith. Plaintiff made inquires with some dealers about obtaining replacement printers. Plaintiff had no experience purchasing on the used equipment market. It needed the printers to be delivered quickly. Based on these considerations, Plaintiff reasonably opted to purchase the new printers from Portland Cash Register and Pacific Cash Register, two supplier with whom it had a longstanding relationship.

38.    As such, the Court will enter judgment in Plaintiff's favor on Count IV in the amount of $601,042.

**Count V of the Complaint**

39.    As previously stated, Count V of the Complaint alleges a breach of contract claim based on Sales Order 516.

40.    At trial, Defendant stipulated that it was liable for $6,240, the amount of damages Plaintiff was seeking on this count. The Court must enforce this stipulation. Gander, 250 F.3d at 609.

41.    As such, judgment will be entered in Plaintiff's favor on Count III of the Complaint in the amount of $6,240.

**Count VI of the Complaint**

42.    As previously stated, Count VI of the Complaint claims that Defendant breached the Development Agreement and Lease Agreement.

43.    In Missouri, to prevail on a breach of contract claim, a plaintiff must prove "the existence of a contract or agreement and the terms of that agreement, that the plaintiff performed or

tendered performance, that the defendant did not perform, and that the plaintiff was thereby damaged." <u>Hunt</u>, 160 S.W.3d at 807.

44.  The parties agree that the Lease Agreement, which incorporated the Pilot Agreement and Development Agreement was a binding contract.

45.  This agreement was performed by both sides until March 20, 2006, the day Defendant terminated.

46.  A tender of performance combines "readiness, willingness and ability to pay." <u>Bolz</u>, 41 S.W.3d at 574 n.5.

47.  Plaintiff has proved that it tendered performance by paying the first two lease payments and offering to place the third in escrow. <u>Rosenthal v. Jordan</u>, 783 S.W.2d 452, 455 (Mo. Ct. App. 1990) (holding, in a breach of contract action, that plaintiff must prove that he tendered performance).

48.  Although plaintiff must usually prove full performance of a contract to recover for a breach, this requirement is excused when "full performance is prevented by acts or conduct of the defendant." <u>Ark Constr. Co. v. City of Florissant</u>, 558 S.W.2d 418, 421 (Mo. Ct. App. 1977); <u>see</u> <u>Midwest Materials Co. v. Vill. Dev. Co.</u>, 806 S.W.2d 477, 488 (Mo. Ct. App. 1991).

49.  Defendant breached the contract by demanding Plaintiff terminate its use of the relevant software programs and by bringing a suit for copyright infringement. In whole, these acts suggested to Plaintiff that it could neither exercise the option contained in the Lease Agreement nor use the software.

50.  The appropriate measure of damages is "the benefit of the bargain," meaning plaintiff is entitled to "the value of the contract to him at the time of the breach or the value of the

promised performance, or the value of the benefit contracted for." <u>Boten v. Brecklein</u>, 452 S.W.2d 86, 93 (Mo. 1970).

51.    Plaintiff put forward evidence that the contract had $319,415 of value to it. This number represents $124,415 paid to Defendant in software development and $185,000 paid to a consulting firm to help conceptualize and implement this plan.

52.    As such, the Court will enter judgment on this Count in the amount of $319,415.

## Counts VI and VIII of the Counterclaim

53.    As previously stated, Count VI of the Counterclaim is an action on account claim.

54.    Defendant stipulated that it owes Plaintiff a credit of $32,323.11. As such, any judgment granted in Defendant's favor will be reduced by that amount.

55.    An action on account is an action brought "to recovery money for property sold and delivered, or for services provided." <u>K & G Farms v. Monroe County Serv. Co.</u>, 134 S.W.3d 40, 43 (Mo. Ct. App. 2003).

56.    In an action on account, plaintiff must show: "(1) defendant requested plaintiff to furnish the merchandise or services, (2) plaintiff accepted defendant's offer by furnishing such merchandise or services, and (3) the charges were reasonable." <u>Austin v. Pickett</u>, 87 S.W.3d 343, 347 (Mo. Ct. App. 2002).

57.    Quantum meruit and an action on account are "equivalent actions." <u>Raysik v. Standiford</u>, 944 S.W.2d 288, 292 (Mo. Ct. App. 1997). Specifically, an action on account looks at whether plaintiff furnished the services at "defendant's request" whereas quantum meruit looks at whether "goods and services were furnished to the defendant and defendant accepted the goods or services." <u>Id.</u>

58.    Plaintiff has stipulated that it owes the following amounts:

a. Invoice No. 205634, listing a balance owed of $693.97.

b. Invoice No. 206085, listing a balance owed of $2,841.

c. Invoice No. 206086, listing a balance owed of $1,368.

d. Invoice No. 206126, listing a balance owed of $500.

e. Invoice No. 206291, listing a balance owed of $123.

59. As such, the Court finds that Plaintiff must pay these invoices, which total $5525.97. Gander, 250 F.3d at 609.

60. The Court finds that Plaintiff requested the services listed in Invoice No. 206266 (travel expenses). Defendant furnished them, the amounts were reasonable, and that Plaintiff did not pay. As such, Plaintiff must pay $623.46, the amount listed in the invoice.

61. The Court finds that Plaintiff requested part of the services listed in Invoice No. 206229. Specifically, Defendant proved that it performed 1.33 hours of "Savers Audit System" at a rate of $125 an hour and Plaintiff accepted that work. Defendant, however, was unable to provide credible evidence that Defendant provided Plaintiff with 16.78 of programming work. Notably, the dates on the invoice were incongruous and Mrs. Jarrett could not offer an explanation. Additionally, neither Mr. Jarrett nor Mrs. Jarrett testified that they saw this work be performed. As such, Plaintiff is liable on Invoice No. 206229 in the amount of $166.25.

62. The Court finds that Defendant cannot recover in either quantum meruit or an action on account for Invoice No. 206304 or Invoice No. 206296 (printer shoes and die). Specifically, Defendant has not shown that it delivered the goods to Plaintiff. Heritage Roofing, LLC v. Fischer, 164 S.W.3d 128, 133 (Mo. Ct. App. 2005) (holding that proof of delivery is necessary in a quantum meruit or action on account claim).

63. The Court finds that Plaintiff cannot recover in either quantum meruit or suit on account for Invoice No. 206272 (seven registers) because Plaintiff was unable to present credible testimony that the printers were actually shipped to Plaintiff. See id.

64. In sum, the Court will award Defendant $ 5,692.22 on these counts.

**Count VII of the Counterclaim**

65. As previously stated, Defendant claims that Plaintiff's failure to pay for one Galaxy computer, as shown by Invoice No. 205878, amounted to unjust enrichment.

66. Defendant also claims that Plaintiff's failure to pay $17,500 in payments on the Lease Agreement amounted to unjust enrichment.

67. Unjust enrichment occurs where a benefit "is conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust." Cridlebaugh v. Putnam County State Bank of Milan, 192 S.W.3d 540, 543 (Mo. Ct. App. 2006).

68. The elements of unjust enrichment are "(a) a benefit conferred by one party on another; (b) appreciation by the receiving party of the fact that what was conferred was a benefit; and (c) acceptance and retention of the benefit that would render that retention inequitable." Childress Painting & Assocs., v. John Q. Hammons Hotels Two, L.P., 106 S.W.3d 558, 562 (Mo. Ct. App. 2003).

69. Upon consideration, the Court finds that Plaintiff's retention of the Galaxy computer satisfies the elements of an unjust enrichment claim. Defendant conferred the benefit of a computer on Plaintiff, which knew the computer was a benefit. Although it wanted to return the computer, it retained the computer without paying for it. It would be inequitable to allow Plaintiff to keep the computer merely because Mrs. Jarrett never sent the proper paperwork.

70.    The Court finds that Plaintiff's use of the software (Invoice No. 206292 and No. 206776) after the March 20, 2006 termination did not amount to unjust enrichment. Specifically, Defendant did not confer a benefit on Plaintiff. Instead, it ordered Plaintiff to discontinue use of its software. Although this discontinuation took some months to complete, Plaintiff stopped using the software.

71.    The Court finds that Defendant cannot recover under a theory of unjust enrichment on Invoice No. 206272 (the seven new printers) or Invoice No. 206229 (the programming work) because Defendant has not shown that it conferred a benefit on Plaintiff.

72.    As such, the Court finds that Plaintiff was unjustly enriched in the amount of $1,432.65 by retaining the Computer. Judgment will be entered in Defendant's favor on this count in the above amount.

## Count IX of Counterclaim

73.    As previously stated, Defendant claims that Plaintiff breached certain contracts.

74.    Plaintiff has put forward evidence that Invoice No. 206304 and Invoice No. 206296 reflect an agreement between the parties to manufacture and attach printer shoes to the printers ordered under the June 29, 2005 Agreement. (Def.'s Ex. L-M).

75.    In Missouri, to prevail on a breach of contract claim, a plaintiff must prove "the existence of a contract or agreement and the terms of that agreement, that the plaintiff performed or tendered performance, that the defendant did not perform, and that the plaintiff was thereby damaged." Hunt, 160 S.W.3d at 807.

76.    Defendant established that a contract existed for these printer shoes. (Def.'s Ex. OO). Defendant also proved that it manufactured the shoes.

77. Plaintiff never tendered payment, which allowed Defendant to "withhold delivery of such goods" and to seek the contract price. Mo. Rev. Stat. § 400.2-703(a), (e).

78. A seller, such as Defendant, is allowed recover the contract price "if ths seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such an effort will be unavailing." Mo. Rev. Stat. § 400.2-709(1)(b).

79. The circumstances indicate that trying to sell these printer shoes would "be unavailing" because Defendant had specially manufactured them for Plaintiff.

80. As such, the Court finds that Plaintiff is liable for $27,335 on Invoice No. 206304 and for $1,065 on Invoice No. 206295.

81. Plaintiff also asserts a breach of contract claim related to Invoice No. 206272 (seven new cash registers). The Court finds that Defendant cannot recover on this claim because it has not provided credible evidence that a contract actually existed.

82. To prove that a contract existed, Defendant must show that there was an offer and an acceptance. See Crestwood Shops, L.L.C. v. Hilkene, 197 S.W.3d 641, 649 (Mo. Ct. App. 2006). Defendant presented evidence that Plaintiff may have requested seven printers in January, but has not presented any credible evidence that it accepted this offer. Defendant also produced evidence that Plaintiff again requested seven printers in March 2006. After receiving no response, Plaintiff rescinded its offer on March 21, 2006. Defendant did not produce evidence of a purchase order or evidence that these cash registers were shipped prior to March 21, 2006. See Woods ex rel. Woods v. Cory, 192 S.W.3d 450, 459 (Mo. Ct. App. 2006) (holding offerer can revoke offer anytime before acceptance). As such, the Court cannot conclude that a contract actually formed because there Defendant has not proved that a valid offer and acceptance occurred.

83. The Court finds that Defendant cannot recover on its breach of contract claim related to Invoice No. 206229 (programing work). Specifically, Defendant failed to put forward credible evidence that 16.78 hours of work was even performed. Absent such evidence, Defendant cannot recover for breach of contract. See Vill. Dev.Co., 806 S.W.2d at 488 (holding plaintiff must fully perform before it can recover for a breach of contract).

84. Defendant asserts a breach of contract claims related to the lease payment invoices (No. 206292 and 206766). Upon consideration, the Court finds that Defendant's claim fails because the evidence shows that it failed to perform fully. Id. The evidence at trial showed that Defendant stopped providing software support and demanded that Plaintiff remove LP from its computers before the first lease payment invoice was sent.

85. As such, this claim is granted in the amount of $28,400.

**Count X of the Counterclaim**

86. In Count X, Defendant's anticipatory breach of contract claims are based on the theory that the parties had entered into a requirements contract, that all of the agreements comprised one contract, and that Plaintiff's seizure of the refurbished printers was an unlawful breach of contract.

87. The Court previously rejected these arguments in this Order and in its Order dated November 15, 2007. (Doc. No. 102).

88. As such, Count X of the Counterclaim is denied.

**Count XI of the Counterclaim**

89. In this count, Defendant claims that Plaintiff breached the implied covenant of good faith and fair dealing found in every contract.

90.     Missouri implies in every contract a covenant of good faith and fair dealing that requires the performance and enforcement of the terms be carried out in good faith. <u>Finova Cap. Corp. v. Ream</u>, 230 S.W.3d 35, 45 (Mo. Ct. App. 2007).

91.     This obligation requires that the parties neither prevent nor hinder performance by the other party. <u>Schell v. LifeMark Hosps. of Mo.</u>, 92 S.W.3d 222, 230 (Mo. Ct. App. 2002). It also requires one party to cooperate with another to enable performance and achievement of the expected benefits. <u>Slone v. Purina Mills, Inc.</u>, 927 S.W.2d 358, 368 (Mo. Ct. App. 1996).

92.     The covenant encompasses "an obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." <u>Spencer Reed Group, Inc. v. Pickett</u>, 163 S.W.3d 570, 574 (Mo. Ct. App. 2005).

93.     This implied covenant, however, is not a general reasonableness requirement. <u>Schell</u>, 92 S.W.3d at 230. Nor is it "an overflowing cornucopia of wished-for legal duties." <u>Comprehensive Care Corp. v. RehabCare Corp.</u>, 98 F.3d 1063, 1066 (8th Cir.1996). Although phrased in moralistic overtones, good faith does not import into contract law the negligence principles of tort law. <u>See</u> <u>Mo. Consol. Health Care Plan v. Cmty. Health Plan</u>, 81 S.W.3d 34, 47-48 (Mo. Ct. App. 2002).

94.     Upon consideration, the Court finds that Plaintiff did not breach the implied covenant of good faith and fair dealing. The evidence before the Court shows that Plaintiff tried to keep the relationship from failing apart. The evidence also shows that Defendant's action caused the relationship's termination. As such, this claim is denied.

    Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment is entered in Plaintiff's favor on Counts II, III, IV, V, and VI of the Complaint in the amount of $1,051,313.74.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that judgment is entered in Defendant's favor on Counts VI, VII, VIII, and IX of the Second Amended Counterclaim in the amount of $3,825.22.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Plaintiff and Defendant are granted until **Friday, February 8, 2008**, in which to file briefs addressing the merits of their claims for pre-judgment interest, court costs, attorneys fees, and any other relief necessary to terminate this controversy. The parties shall articulate the precise values, and to the extent necessary the method of calculation, of their various claims. The parties shall then have until **Friday, February 15, 2008**, in which to file a response. A separate order of judgment will accompany this Findings of Fact and Conclusions of Law.

Dated this 28th day of January, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE